UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
                                                04 Civ. 3951 (MGC)

Legislator 1357 Limited and
Legislator 1358 Limited,

            Plaintiffs,

    -against-                                   OPINION

Metro-Goldwyn-Mayer, Inc.,
Metro-Goldwyn-Mayer Studios Inc.,
Metro-Goldwyn-Mayer Home
Entertainment Inc., Danjaq LLC
and Eon Productions Limited,

            Defendants.

-------------------------------X


APPEARANCES:

            COWAN, DeBAETS, ABRAHAM & SHEPPARD
            Attorneys for Plaintiffs
            41 Madison Avenue, 34th Floor
            New York, NY 10010

            By:  David B. Wolf
                 Matthew Kaplan


            LOEB & LOEB
            Attorneys for Defendants
            345 Park Avenue
            New York, NY 10154

            By:  Jonathan Zavin
                 Jacques Rimokh
                 Sunny Park

**CEDARBAUM, J.**

Plaintiffs claim ownership of the late Ian Fleming's copyright in the story *Chitty Chitty Bang Bang: the Magical Car* ("*Chitty Chitty Bang Bang*," the "Work"), and assert that defendants have infringed the renewed copyright by distributing a movie based on that story. Plaintiffs move for partial summary judgment on the issue of defendants' liability for copyright infringement. Defendants argue that plaintiffs do not own the film rights to *Chitty Chitty Bang Bang* and, alternatively, that equitable doctrines bar relief. Defendants request dismissal of the claims against Danjaq LLC ("Danjaq") and Eon Productions Limited ("Eon"). For the following reasons, plaintiffs' motion is denied, and defendants' request is granted.

<u>BACKGROUND</u>

The history of this action begins in 1962 when Ian Fleming, a veteran author and the creator of James Bond, finished writing *Chitty Chitty Bang Bang*. On December 7, 1962, Fleming assigned rights in the Work to Glidrose Publishing Ltd. ("Glidrose"), a company of which he was the sole owner. The assignment to Glidrose included all of

2

Fleming's rights in the Work except film, television, serial, and cartoon strip rights.  One week later, on December 19, 1962, Fleming assigned these remaining rights in the Work to a trust created for the purpose of holding rights in his books (the "Book Trust").

On June 12, 1963, approximately six months after the assignment from Fleming to Glidrose, Glidrose entered into an agreement with a third party to publish the Work in the United Kingdom.  On September 18, 1963, Fleming entered into an agreement with Random House to have the Work published in the United States.  Fleming proceeded to prepare the Work for publication, including reviewing and revising the publishers' drafts of his story.

On August 12, 1964, two months before the Work was published, Fleming died.  His estate passed into the control of another trust (the "Will Trust") that was established for the benefit of his family.  Under the law of the United Kingdom, the trustees of the Will Trust are vested with all the rights and responsibilities of executors of Fleming's estate.

After Fleming's death, the Work was published in periodical and book form.  Random House registered a periodical version of the Work with the United States Copyright Office on November 24, 1964 and a book version on

January 8, 1965.  Random House listed Glidrose as the claimant and Fleming as the author.

On May 5, 1965, the Book Trust assigned the film and television rights in the Work to Eon.  That assignment purported to include the film and television rights "throughout the World for the entire period of copyright and all extensions and renewals thereof."  In a later provision in the same assignment to Eon, the trustees of the Book Trust warranted that "the Trustees are the absolute owners of the rights herein intended to be granted and assigned to the Purchaser hereby" and further agreed to indemnify Eon for any damages arising from a breach of that warranty.  Eon assigned its interest in the Work to Danjaq.  Danjaq assigned its interest in the Work to United Artists Corporation ("UAC"), MGM's predecessor in interest.  In 1968, UAC financed and distributed a film version of the Work.

At the time the Book Trust assigned the film rights, the Book Trust and Will Trust held separate interests in the Work, were governed by separate trust documents, and were controlled by different trustees.  The trusts, however, had overlapping beneficiaries.  In 1965, the beneficiaries of the Will Trust were Ian Fleming's widow and son as well as Fleming's brother and his brother's three daughters.  During

the same period, the beneficiaries of the Book Trust
included all of the beneficiaries of the Will Trust as well
as Fleming's stepdaughter and her family.  None of the
trustees of the Book Trust also served as a trustee of the
Will Trust.

Under the copyright law then in effect, the Work had an
initial copyright term of 28 years and was eligible for
renewal on January 1, 1993.  Raymond Arthur Clanaboy, Baron
O'Neill, one of the original trustees of the Will Trust,
applied for renewal of the periodical copyright on July 15,
1992 in his role as trustee.  He applied for renewal of
copyright in the book on August 5, 1992.

By the time the renewal term began on January 1, 1993,
the trustees and trust beneficiaries had changed.  Ian
Fleming's widow, son, and brother had all died.  One of
Fleming's nieces, for reasons not in the record, no longer
benefited from the trusts.  The remaining two nieces had
married, and their husbands and children also benefited from
both trusts.  Ian Fleming's stepdaughter and her family
continued to benefit from the Book Trust but not the Will
Trust and remained the only beneficiaries who did not
benefit from both.  By this time, the trustees had changed
as well.  All of the original trustees of the Will Trust
except Baron O'Neill had been replaced.  Defendants argue

that the most significant change was the inclusion of one of
Ian Fleming's nieces, Kate Grimond, as a trustee of the Book
Trust.  At that time, Grimond was a trustee of the Book
Trust as well as a beneficiary of both the Book Trust and
the Will Trust.

After the renewal term began in 1993, MGM continued to
exploit the film version of the Work by assigning television
rights and selling VHS and DVD copies.  Most significantly,
MGM asserts that in 2002 it spent approximately $1.6 million
on a special edition DVD version of the Work.  MGM currently
sells copies of the film and has obligations to assignees
that continue until 2012.  Between 1993 and the date on
which this action was commenced, plaintiffs and defendants
were in intermittent contact regarding the Work.

Presently, two of Ian Fleming's nieces, Lucy Williams
and Kate Grimond, and their families continue to benefit
from both trusts.  Ian Fleming's stepdaughter and her family
continue to be beneficiaries only of the Book Trust.  Kate
Grimond and Lucy Williams are now the sole trustees of the
Book Trust.  The trustees of the Will Trust are Legislator
1357 and Legislator 1358, entities wholly controlled by Kate
Grimond and Lucy Williams.  Defendants emphasize that both
trusts are now controlled by the same two trust
beneficiaries.  This is in marked contrast to the structure

of the trusts in 1964, when there was no overlap among the trustees of the two trusts and when no beneficiary of either trust served as a trustee.

Despite MGM's continuous distribution of a derivative work based on *Chitty Chitty Bang Bang*, plaintiffs now claim that defendants have had no right to the Work since the first copyright term ended thirteen years ago.  Plaintiffs argue that by operation of 17 U.S.C § 304 the renewed copyright vested in the Will Trust, of which they are the trustees.  Plaintiffs argue that the trustees of the Book Trust could only grant a contingent interest in the renewal term and since the copyright in the renewal term vested in the trustees of the Will Trust, only a grant by the trustees of the Will Trust could have given defendants rights in the renewed copyright.

Defendants present three arguments in support of their contention that their exploitation of film rights does not infringe the renewed copyright in the Work.  First, defendants argue that *Chitty Chitty Bang Bang* is a posthumous work and that therefore the renewal rights vested in the Book Trust, the then proprietor of the copyright, and not in the Will Trust.  Second, defendants argue that the two trusts are so similar that a transfer of renewal rights made by the Book Trust can be attributed to the Will Trust.

Third, defendants argue that equitable principles bar plaintiffs' claim against them.

## DISCUSSION

### I. Standard of Review

A motion for summary judgment should be granted if the court determines, from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Richardson v. Coughlin, 763 F. Supp. 1228, 1234 (S.D.N.Y. 1991). In deciding whether a genuine issue exists, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993). The moving party bears the initial burden of informing the court of the basis

for its motion and proffering evidence that demonstrates the absence of a genuine issue of material fact.


II. Copyright Renewal Rights


In 1962 when Ian Fleming wrote *Chitty Chitty Bang Bang*, 17 U.S.C. § 24 (the "1909 Act") entitled an author to copyright for an initial 28 year term with a right to renew the copyright for an additional 28 years.  In the initial term, an author's interest in a copyrighted work was vested and could be freely assigned to others.  An author's interest in the renewal term, however, was only an expectancy until the initial term ended and the renewal term began.  <u>Miller Music Corp. v. Charles Daniels, Inc.</u>, 362 U.S. 373, 375 (1960).  An author could assign his contingent interest in the renewal term, but if the author died before the date of renewal, the copyright passed, by operation of law, to the author's wife, children, executor, or next of kin without regard to the author's prior assignments.  <u>Id.</u>; <u>Fred Fisher Music Co. v. M. Witmark & Sons</u>, 318 U.S. 643, 657-58 (1943); 17 U.S.C. § 24 (current version at 17 U.S.C. § 304).

In creating renewal rights in the 1909 Act, Congress was interested in giving authors and their families a second chance to benefit from creative works which might have been sold cheaply during the initial copyright term.  Fred Fisher Music Co., 318 U.S. at 653-54.  Although authors could assign their renewal rights, those assignments were conditioned by law on the survival of the author into the renewal term.  In interpreting the 1909 Act, the Supreme Court recognized that:

> [The Copyright Act] reflects, it seems to us, a consistent policy to treat renewal rights as expectancies until the renewal period arrives.  When that time arrives, the renewal rights pass to one of the four classes listed in [the Copyright Act] according to the then-existing circumstances.  Until that time arrives, assignees of renewal rights take the risk that the rights acquired may never vest in their assignors.

Miller Music, 362 U.S. at 377-78.

In this case, the trustees of the Book Trust purported to assign film rights in the renewal term to Eon.  If the rights in the renewal term had vested in the trustees of the Book Trust, their assignment to Eon would have been effective.

By the time the copyright was renewed on January 1, 1993, Ian Fleming, his wife, and his son had all died. Under 17 U.S.C. § 304, the executors of Fleming's estate

were entitled to obtain copyright for the renewal term.
Under the law of the United Kingdom, the trustees of the
Will Trust are vested with all the rights of the executors
of Fleming's estate.  Therefore, the copyright in the
renewal term of *Chitty Chitty Bang Bang* passed to the
trustees of the Will Trust free and clear of any assignments
made by any other party.

Defendants do not dispute that, usually, when an author
and his immediate family have all died during the initial
term of copyright, the renewal rights pass to the executor
of the author's estate.  But defendants argue that the usual
line of succession is not applicable here because *Chitty
Chitty Bang Bang* was a posthumous work.


III. Posthumous Works

Section 304(b) of the Copyright Act, 17 U.S.C. §
304(b), reads:

> In the case of (i) any posthumous work ... the
> proprietor of such copyright shall be entitled to a
> renewal and extension of the copyright[].

Defendants argue that despite Ian Fleming's
involvement in assigning the Work to publishers and
preparing the Work for publication, the fact that he died

prior to publication makes the Work posthumous within the meaning of the copyright law.  They argue that because the Work is posthumous, the proprietor of the copyright, and not the executor, owns the copyright in the renewal term. Defendants assert that the Book Trust is the proprietor of the copyright, and therefore the grant of film rights in the renewal term to Eon by the trustees of the Book Trust effectively transferred those rights to Eon.

Although defendants contend that the 1909 Act governs the renewal term for works created prior to January 1, 1978, defendants acknowledge that the term "posthumous work" is not defined in either the 1909 or 1976 Copyright Act.  Defendants argue that the commonly understood definition of a "posthumous work" under the 1909 Act was a work first published after the author's death.  The only case defendants cite for this proposition is Bartok v. Boosey & Hawkes, Inc., 382 F. Supp. 880, 883-84 (S.D.N.Y. 1974)("Bartok I").  Bartok I, however, was reversed by the Second Circuit on exactly this issue in Bartok v. Boosey & Hawkes, Inc., 523 F.2d 941 (2d Cir. 1975)("Bartok II"). Defendants' contention that a work published after an author's death is automatically a posthumous work under either the 1909 or 1976 Copyright Act is not correct.

In Bartok II, the Second Circuit reversed the district court, and held that a symphony, published six months after its author's death, was not a "posthumous work" within the meaning of the Copyright Act of 1909. The Second Circuit relied on several factors:

> "In this case, Bartok had completed the Concerto, had heard it performed, had executed a contract for its copyright, and had corrected published proofs, all before his death. While the tangible copies had not been distributed to the public before Bartok's death, orchestra parts had been distributed at least to members of the Boston Symphony and the general public had heard the Concerto both in concert and on the radio. The work, as they heard it, was substantially as Bartok intended it to be heard, and the proofs contained his revisions."

Bartok II, 523 F.2d at 945-46.

The Second Circuit clearly rejected defendants' contention that a work is automatically a posthumous work if published after its author's death. Yet, despite the similarities between Bartok II and the present situation, defendants argue that Bartok II is inapplicable because, in contrast to Bartok's symphony, *Chitty Chitty Bang Bang* was never publicly performed or disseminated prior to the author's death. The Second Circuit, however, twice noted that assignment of rights, and not public dissemination, is the critical factor in determining whether a work is posthumous. Id. at 944, 946 n. 7. Furthermore, the House

13

Report on the Copyright Act of 1976 endorsed <u>Bartok II</u> and understood that case to define the term "posthumous work" as "one as to which no copyright assignment or other contract for exploitation of the work has occurred during an author's lifetime, rather than one which is simply first published after the author's death." <u>House Report No. 94-1476</u>. <u>See also</u> 3 Nimmer on Copyright § 9.03(a)(reaching the same conclusion about the interpretation of <u>Bartok II</u>).

In addition to assigning the copyright and entering into contracts during his lifetime, Ian Fleming revised manuscripts for publication.  Under the standard laid out in <u>Bartok II</u>, *Chitty Chitty Bang Bang* is not a posthumous work.  The rights in the renewal term therefore vested in the trustees of the Will Trust as executors of Fleming's estate and not, as defendants contend, in the trustees of the Book Trust.

### IV. The Relationship Between the Book Trust and the Will Trust

Defendants argue that even if the copyright in the renewal term vested in the trustees of the Will Trust, the relationship between the trustees of the Will Trust and the trustees of the Book Trust and among the beneficiaries of the two trusts is so intertwined that a grant from the

14

trustees of the Book Trust is equivalent to a grant from the trustees of the Will Trust.

Hugh Greenwood and Charles Farrer were the sole trustees of the Book Trust when the trust's interest in the renewal term was assigned to Eon.  At that time, the beneficiaries of the Book Trust were Ian Fleming's wife and son, Fleming's stepdaughter and her family, Fleming's brother Peter, and Peter's three daughters and their families.  With the exception of Fleming's stepdaughter and her family, who were not included in the Will Trust, the beneficiaries of the Book Trust were also the only beneficiaries of the Will Trust.

In their role as trustees, Hugh Greenwood and Charles Farrer assigned the Book Trust's film and television rights in the Work to Eon.  The assignment was made in a standard form document that had been used in prior assignments from Fleming to Eon for the production of films based on the James Bond character.  In addition to copyright during the initial term, the assignment to Eon purported to transfer film copyright in the renewal term of the Work as well.

Eon and the trustees of the Book Trust believed that Eon was receiving film and television rights in the renewal

term.  Defendants present two distinct theories to support
their argument that the assignment by the Book Trust binds
the Will Trust.  First, defendants argue that because the
Will Trust beneficiaries are all beneficiaries of the Book
Trust, a grant by the trustees of the Book Trust binds the
trustees of the Will Trust.  Second, defendants argue that
the two trusts acted jointly to such a degree that a grant
by one should be considered a grant by the other.

A.  Overlapping Beneficiaries

Defendants argue that when the trustees of the Book
Trust assigned rights to Eon, they were acting on behalf of
the individual beneficiaries of the Book Trust.  According
to defendants, this assignment, although made by the
trustees, is binding on each beneficiary of the Book Trust
as if each beneficiary had made an individual assignment.
In other words, defendants argue that the assignment made
by Hugh Greenwood and Charles Farrer as trustees
constitutes an assignment by Ian Fleming's wife, son,
stepdaughter, brother, and nieces of their individual
expectancies in the renewal term.

Building on the argument that an assignment by a
trustee binds each individual beneficiary, defendants argue
that the trustees of the Will Trust are bound by any
assignment made by the beneficiaries of the Will Trust.
Defendants maintain that when the trustees of the Will
Trust were vested with the copyright in the renewal term of
the Work, those trustees were bound by the prior
assignments of the trust beneficiaries.  In other words,
the trustees of the Book Trust bound the trust
beneficiaries who in turn bound the trustees of the Will
Trust.

Each trust and each beneficiary held different
contingent interests in the renewed copyright.  Defendants'
argument fails because Ian Fleming's interest in the
renewal term never vested.  At the time Fleming transferred
rights in the Work to the Book Trust, he held only a
contingent interest in the rights in the renewal term.
Fleming's contingent interest was only one of several
contingent interests such as those of his wife, son,
executors, and next of kin which were all statutorily
derived and existed without regard to Fleming's interest.
When Ian Fleming assigned rights in the renewal term, he
was not capable of assigning the contingent interest of

anyone but himself.  Miller Music Corp., 362 U.S. at 375.
Because the Book Trust held the contingent interest of Ian
Fleming, the trustees of the Book Trust could assign to Eon
only the interest that the trust received from Fleming, not
the separate interests of Fleming's wife, son, executors,
or next of kin.

Each beneficiary of the Book Trust held an equitable
interest in the property of the trust, which included an
equitable interest in Ian Fleming's contingent interest in
the renewal term.  It was this equitable interest which was
affected by the assignment made by the trustees of the Book
Trust to Eon.  The equitable interest, however, was
unrelated to the independent contingent interests created
by operation of 17 U.S.C. § 304.  None of the contingent
interests held personally by Ian Fleming's family members
or by the trustees of the Book Trust ever vested.  The
contingent interest that eventually vested was the one the
Copyright Act bestowed upon the executors of Fleming's
estate, which was also independent of the contingent
interests held by the trustees of the Book Trust and the
individual family members.

Although Eon and its successors in interest may not
have anticipated that the copyright during the renewal term

would never vest in the Book Trust, the "assignees of renewal rights take the risk that the rights acquired may never vest in their assignors.  A purchaser of such an interest is deprived of nothing.  Like all purchasers of contingent interests, he takes subject to the possibility that the contingency may not occur." Miller Music Corp., 362 U.S. at 378.  When the trustees of the Will Trust, as executors of Fleming's estate, obtained the rights in the renewal term by operation of the Copyright Act, the trustees of the Will Trust took the rights free of any assignment made by the trustees of the Book Trust.  Id. at 377-78; Music Sales Corp. v. Morris, 73 F. Supp. 2d 364, 375 (S.D.N.Y. 1999).


B.  Collaboration Between the Trusts

In addition to their other arguments, defendants contend that the Book Trust and the Will Trust shared complete unity of control and financial interest, and therefore a grant from one can be considered a grant from the other.  The only evidence that defendants have for the proposition that the trusts are intertwined is one incident in which the two sets of trustees allegedly met together

and agreed that if there were adequate distributions being made from the Will Trust for Ian Fleming's nieces then the trustees would agree to distribute income to Ian Fleming's step-daughter's children out of the Book Trust.  This single incident occurred approximately eleven years after the trustees of the Book Trust and Eon entered into their agreement.  Defendants have presented no legal basis for the theory that a single incident of cooperation between two trusts makes every act of each trust the act of both.

Although defendants make a final contention based on a heavily redacted memorandum from MGM's Senior Counsel, the memorandum is too cryptic to constitute meaningful evidence that the assignment from the trustees of the Book Trust to Eon can be treated as an assignment from the trustees of the Will Trust.

In 1965, none of the trustees of the Will Trust served as a trustee of the Book Trust.  The beneficiaries of each trust were not identical.  The beneficiaries and trustees all held separate contingent interests in the renewal term of the Work.  Defendants have failed to present any evidence that the Book Trust and the Will Trust cooperated to such an extent that the 1965 assignment of the Book

Trust's contingent interest could be considered an assignment of the Will Trust's contingent interest.


V. Equitable Defenses

Finally, defendants argue that the equitable principles of laches and equitable estoppel should bar plaintiffs' claims in their entirety.

Laches and equitable estoppel both bar claims if a defendant has relied on a plaintiff's conduct to its detriment, but the defenses are not identical.  The defense of laches bars a claim when a defendant has suffered prejudice because of a plaintiff's unreasonable and inexcusable delay in bringing the claim.  <u>New Era Publ'ns Int'l v. Henry Holt & Co.</u>, 873 F.2d 576, 584 (2d Cir. 1989).  Laches bars claims for prior infringement but does not prevent a plaintiff from pursuing future damages for infringement arising later in time.  The defense of equitable estoppel applies when "the party to be estopped had knowledge of defendant's infringing conduct, and either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended.  Additionally, the defendant

must be ignorant of the true facts and must rely on plaintiff's conduct to his detriment." <u>Lottie Joplin Thomas Trust v. Crown Publishers, Inc.</u>, 456 F. Supp. 531, 535 (S.D.N.Y. 1977). Unlike laches, equitable estoppel can be used to prevent a plaintiff from recovering prospective as well as past damages. <u>DeCarlo v. Archie Comic Publ'ns, Inc.</u>, 127 F. Supp. 2d 497, 508-511 (S.D.N.Y. 2001).

Defendants argue that plaintiffs are barred from bringing their claims because, in reliance on plaintiffs' conduct, the MGM defendants have spent millions of dollars promoting *Chitty Chitty Bang Bang* since the copyright renewal term took effect in 1993 and have entered into various contractual obligations related to the Work. In addition, defendants argue that, after the copyright was renewed, agents of the plaintiffs represented that defendants owned the film rights in the renewal term of the Work. Plaintiffs respond that equitable defenses cannot bar a timely claim under a statute which, like the Copyright Act, contains an express statute of limitations. Furthermore, if equitable defenses are available, plaintiffs request an opportunity to engage in discovery on the issue.

Even though in this case the facts supporting the defenses of laches and equitable estoppel are substantially similar, equitable estoppel and laches are not equally available in copyright infringement actions.  Although the two defenses have similarities, laches is viewed as the equitable equivalent of a statute of limitations, see Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259-60 (2d Cir. 1997), while equitable estoppel does not have a legal counterpart.  Equitable estoppel has been applied in copyright infringement suits seeking both equitable and legal relief.  Broadcast Music, Inc. v. Hearst, 746 F. Supp. 320, 329 (S.D.N.Y. 1990); Tempo Music, Inc. v. Myers, 407 F.2d 503, 507 n.8 (4th Cir. 1969).  In contrast, the role of laches in barring a copyright infringement claim is uncertain.

The courts of appeals that have addressed the application of laches to copyright infringement claims have reached different conclusions.  The Ninth Circuit allows laches to bar copyright infringement claims whether the relief sought is legal or equitable.  Danjaq LLC. v. Sony Corp., 263 F.3d 942, 953-54 (9th Cir. 2001).  The Fourth Circuit has ruled that the doctrine of laches never bars a timely infringement claim.  Lyons Parternship, L.P. v.

<u>Morris Costumes, Inc.</u>, 243 F.3d 789, 797-99 (4th Cir. 2001).  The Tenth Circuit takes a third approach, ruling that laches is available to bar a timely infringement claim in "rare cases." <u>United States v. Rodriguez-Aguirre</u>, 264 F.3d 1195, 1208 (10th Cir. 2001); <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 951 (10th Cir. 2002).

The Second Circuit has not decided the issue.  The only decision in which the Second Circuit applied laches to bar a copyright infringement claim for damages was vacated, and the subsequent opinion expressly reserved that question.  <u>Stone v. Williams</u>, 873 F.2d 620 (2d Cir. 1989), <u>vacated by</u>, <u>Stone v. Williams</u>, 891 F.2d 401 (2d Cir. 1989); <u>but see</u> <u>New Era Publ'ns Int'l v. Henry Holt & Co.</u>, 873 F.2d 576, 584 (2d Cir. 1989)(applying laches to bar injunctive relief in the copyright setting).  In the context of race and gender discrimination claims, the Second Circuit has stated that the "prevailing rule … is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." <u>Ivani Contracting Corp.</u>, 103 F.3d at 260.  Section 507 of the Copyright Act provides an express

three year statute of limitations that applies to all civil actions brought under the provisions of the Act.

Yet, despite the dictum in <u>Ivani</u>, the difficulty of applying the statute of limitations in cases involving ongoing infringement has led judges in the Southern District to make an exception to the "prevailing rule" in cases of copyright infringement.  <u>See</u> <u>Newsome v. Brown</u>, No. 01 Civ. 2807 (TPG), 2005 WL 627639 (S.D.N.Y. March 16, 2005); <u>Armstrong v. Virgin Records, Ltd.</u>, 91 F. Supp. 2d 628 (S.D.N.Y. 2000); <u>Minder Music Ltd. v. Mellow Smoke Music Co.</u>, No. 98 Civ. 4496 (AGS), 1999 WL 820575 (S.D.N.Y. October 14, 1999); <u>Byron v. Chevrolet Motor Div.</u>, No. 93 Civ. 1116 (AJP), 1995 WL 465130 (S.D.N.Y. August 7, 1995); <u>see also</u> David E. Harell, *Difficulty Counting Backwards from Three*, 48 SMU L. Rev. 669 (1995)(discussing some of the problems inherent in applying the Copyright Act's statute of limitations).

Although the question of whether a defense of laches is available in a copyright infringement action is not settled in this Circuit, defendants may assert a defense of equitable estoppel to bar plaintiffs' infringement claims. Even though defendants' memorandum of law addresses the defense of laches, the facts defendants rely upon and their

arguments are properly characterized as raising the defense of equitable estoppel asserted in their answers to the amended complaint.  Because the evidence that defendants proffer addresses the defense of equitable estoppel, it is not necessary to decide whether a defense of laches is also available.

Defendants have raised a genuine issue of disputed fact as to whether plaintiffs should be equitably estopped from pursuing their copyright infringement claims. Representations by plaintiffs after Fleming's death and lengthy delay in filing this action, as well as defendants' good faith belief that plaintiffs viewed them as the owners of the film rights in the Work raise a genuine issue of disputed fact with respect to the defense of equitable estoppel.  Both parties will be entitled to additional discovery related to equitable estoppel in order to prepare for a trial of that issue.

## VI.Evidence Against Danjaq and Eon

Danjaq and Eon seek to have the claims against them dismissed on the ground that they have not engaged in infringing conduct with respect to *Chitty Chitty Bang Bang*

during the renewal term.  Plaintiffs oppose defendants'
request on the ground that Section 106(2) of the Copyright
Act provides that copyright owners have the exclusive right
to authorize a derivative work, and that by assigning
rights to MGM's predecessor in interest, Danjaq and Eon are
contributing to MGM's ongoing infringement.  Additionally,
plaintiffs argue that because Danjaq and Eon claim rights
in the movie version of the Work, the companies have
infringed plaintiffs' copyright.

The only evidence plaintiffs proffer in support of
these claims is the undisputed fact that, between 1965 and
1968, Danjaq and Eon assigned movie rights in *Chitty Chitty
Bang Bang* to MGM's predecessor in interest.  At the time
the assignments took place, the Work was in its initial
copyright term and Eon was the owner of the film rights.
Plaintiffs have proffered no evidence that those
assignments in the initial term of copyright contained any
provisions which infringed the copyright in the renewal
term.  MGM, on the other hand, has proffered evidence that
Danjaq and Eon have not received any money or been involved
in the distribution of the Work during the renewal term.
Furthermore, plaintiffs have proffered no evidence that
Danjaq and Eon have any direct and ongoing relationship

with MGM or had any knowledge of infringing activity which
would make them liable as contributory infringers.  See
Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S.
417, 437 (1984)(noting that contributory infringement
applies in cases of a direct and ongoing relationship at
the time of infringement); Gershwin Pub. Corp. v. Columbia
Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir.
1971)(discussing that "one who, with knowledge of the
infringing activity, induces, causes or materially
contributes to the infringing conduct of another, may be
held liable as a 'contributory' infringer.")

     Plaintiffs argue that Danjaq and Eon are liable for
copyright infringement because the companies continue to
"claim to have film rights" in the Work.  From plaintiffs'
submissions it is impossible to tell what "claim to have
film rights" means or how claiming an interest in a
copyrighted work infringes a copyright owner's exclusive
rights under 17 U.S.C. § 106.  Moreover, plaintiffs have
not proffered any evidence of infringing conduct.

     Although Danjaq and Eon have not formally moved for
summary judgment, their request is the mirror image of
plaintiffs' motion for summary judgment.  The prevailing
view is that "a court need not give notice of its intention

to enter summary judgment *against* the moving party." <u>Coach
Leatherware Co. v. AnnTaylor, Inc.</u>, 933 F.2d 162, 167 (2d
Cir. 1991)(emphasis in original).  In this case, plaintiffs
had notice that Danjaq and Eon sought to have the claims
against them dismissed, and plaintiffs responded in writing
and at oral argument.  Since plaintiffs have proffered no
evidence of infringing conduct on the part of Danjaq and
Eon, there is no genuine issue of disputed fact with
respect to the claims against those defendants.
Accordingly, summary judgment is granted in favor of Danjaq
and Eon on plaintiffs' unsupported claims against them.


<u>CONCLUSION</u>


     Plaintiffs moved for summary judgment on defendants'
liability for copyright infringement.  While plaintiffs
have demonstrated ownership of the film rights in *Chitty
Chitty Bang Bang*, defendants have raised a genuine issue of
disputed fact as to whether plaintiffs should be equitably
estopped from suing defendants for copyright infringement.
Plaintiffs have also failed to proffer any evidence that
Danjaq and Eon have infringed the copyright in the Work.

For the foregoing reasons, plaintiffs' motion for partial summary judgment on the liability of defendants for copyright infringement is denied, and summary judgment is granted in favor of Danjaq and Eon on plaintiffs' claims against those two entities.

SO ORDERED

Dated:    New York, New York
          September 21, 2006

                          S/ _____
                             MIRIAM GOLDMAN CEDARBAUM
                             United States District Judge